**NEW YORK FOOTBALL GIANTS, INC.,**
Appellant.

v.

**LOS ANGELES CHARGERS FOOTBALL CLUB, INC., and Charles Flowers,**
Appellees.

No. 18591.

United States Court of Appeals
Fifth Circuit.

June 14, 1961.

Joel T. Camche, J. Howard Carter, New York City, James Hugh Ray, Tupelo, Miss. (Lumpkin, Holland & Ray, Tupelo, Miss., Townley, Updike, Carter & Rodgers, New York City, of counsel), for appellant.

James McClure, Herbert M. Fant, Sardis, Miss., Lester G. Fant, Jr., Holly Springs, Miss. (McClure, Fant & McClure, Sardis, Miss., of counsel, for Los Angeles Chargers Football Club, Inc.; R. P. Crutcher, Jr., Holly Springs, Miss., of counsel, for Charles Flowers) for appellees.

Before TUTTLE, Chief Judge, RIVES, Circuit Judge, and DE VANE, District Judge.

TUTTLE, Chief Judge.

In the case of Detroit Football Company v. Robinson, 186 F.Supp. 933, 934, Judge Wright, of the District Court for the Eastern District of Louisiana, said:

"This case is but another round in the sordid fight for football players, a fight which begins before these athletes enter college and follows them through their professional careers. It is a fight characterized by deception, double dealing, campus jumping, secret alumni subsidization, semi-professionalism and professionalism. It is a fight which has produced as part of its harvest this current rash of contract jumping

suits. It is a fight which so conditions the minds and hearts of these athletes that one day they can agree to play football for a stated amount for one group, only to repudiate that agreement the following day or whenever a better offer comes along. So it was with Johnny Robinson."

■ We have read cases cited in Judge Wright's opinion and we share his disgust at the sordid picture too often presented in this kind of litigation. So much so, in fact, that we conclude that in an appropriate case the federal equity court, which is the tribunal usually appealed to for a decree of specific performance or injunction, must decline to lend its aid to either party to a transaction that in its inception offends concepts of decency and honest dealing, such as the case before us.

In the fall of 1959 Flowers was an outstanding football player on the University of Mississippi team. His team was to play a post-season game on January 1, 1960, at the Sugar Bowl in New Orleans against a traditional rival, Louisiana State University.

The well understood rules of the Southeastern Conference (SEC) and the National Collegiate Athletic Association (NCAA) [1] made ineligible from further participation in intercollegiate games any player who had signed a contract to play with a professional team. Flowers wanted above all else to play in the Sugar Bowl game. On a trip to New York City for other purposes he was invited by the Giants' official Mara to come to his office where he was urged to sign a contract to play two seasons, beginning in 1960, with the Giants. He told Mara he wanted to retain his eligibility to play in the Sugar Bowl game. The manner in which this was made clear to Mara and the device by which Mara persuaded Flowers to sign the contract and deceive his coach, the University and the opposing team, as well as the college football public, can most satisfactorily be expressed by quoting Mara's own testimony on cross-examination:

"Q. Prior to the signing of any instrument in your office between you and Charles Flowers, Flowers made it clear to you, didn't he, that the University of Mississippi Football Team had been invited to play in the Sugar Bowl Game on January 1st in New Orleans. You knew that? A. Yes, sir.

"Q. Didn't he make it clear to you prior to the signing of the contract, or paper, in your office on December 1st, he did not want to do anything that would destroy his eligibility as a player in that game? A. We discussed that earlier.

"Q. Did he make that crystal clear he did not want to do anything, or sign any paper in your office on December 1st, that would destroy his eligibility as a player in that game? A. I certainly understood that. Yes, sir.

"Q. He made it crystal clear to you that was his attitude about it, wasn't it? A. I knew that was his attitude.

"Q. In order for you to have a binding contract with Mr. Flowers in the paper that was signed and exhibited here as # 3 to your testimony, and allow him to play in the Sugar Bowl Game, what proposal did you make to Mr. Flowers as to how he could sign the paper and play in the game?

* * * * * *

1. SEC Constitution and By-Laws, 1959, Rule VIII:
"Professionalism.
Any student who signs a contract or enters into any agreement, explicit or implicit, with a professional team * * * shall not be eligible for intercollegiate athletics."

NCAA Constitution, 1958–1959, Article III:
"Principle of Amateurism. * * * One who takes or has taken pay, or has accepted the promise of pay, in any form, for participation in athletics * * * does not meet [the] definition of an amateur."

"A. That the signing of the contract would be kept confidential.

"Q. Kept confidential. So your proposal was that he could sign the paper and play in the game and you would keep it a secret. Is that correct? A. That is correct.

"Q. Why did you want to keep it a secret? A. I knew if it were revealed, that Flowers would not be permitted to play in the Sugar Bowl Game.

"Q. You knew Coach Vaught, the Head Coach at Ole Miss? A. Yes, sir.

"Q. You had known him a number of years? A. I first met him in '58, I believe.

"Q. You knew that if Coach Vaught knew this young man, Flowers, had signed a contract in your office on December 1st, obligating his service to your team, Coach Vaught would not have allowed him to play in that Sugar Bowl Game, didn't you?

* * * * * *

"A. That was my feeling.

"Q. That was your feeling. That was one reason you wanted to keep the matter a secret, wasn't it? A. That's correct."

Following such proposal by Mara, Flowers signed the standard form of contract of the National Football league, and received checks totalling $3500 as a sign-on bonus, and then returned to Mississippi. One of the terms of the contract was that: "This agreement shall become valid and binding upon each party hereto only when, as and if it shall be approved by the Commissioner." Part of the deceit agreed to between the parties was an agreement that Mara would not submit the contract to the Commissioner until after January 1st. Flowers later made some effort by telephone on or about December 5th to withdraw from the contract. Thereafter, the Giants promptly filed the contract with the Commissioner, and he "approved" it on December 15th. However, at Mara's request, he withheld announcement of his approval until after January 1st. On December 29th Flowers had negotiations with the Los Angeles Chargers, as a result of which he was offered a better contract, but which was not formally executed until after the Sugar Bowl game on January 1st. He wrote a letter to the Giants on December 29th stating that he was withdrawing from his agreement with them. He returned the uncashed checks for the bonus money. Flowers played in the game, all of his fans presumably thinking that he was still an eligible player, thanks to the deception proposed by the Giants and entered into by him.

The trial court held that until the "contract" was approved by the Commissioner it was not binding. See Detroit Football Co. v. Robinson, supra; Los Angeles Rams Football Club v. Cannon, D.C., 185 F.Supp. 717, and Chicago Cardinals Football Club, Inc. v. Etcheverry, No. 3186 Civil, D.C.N.M. It held, therefore, that when Mara, contrary to his agreement not to submit the contract to the Commissioner until after January 1st, did so, the approval by the Commissioner was not effective to make it binding and that Flowers still had the legal right to cancel until January 1st. The trial court, therefore, entered judgment for both defendants.

■■ Without considering the legal issues on the merits, we affirm the judgment of the trial court. We do so by application of the age-old, but sometimes overlooked, doctrine that "he who comes into equity must come with clean hands." A recent discussion of this maxim by the United States Supreme Court is controlling here:

"The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however im-

proper may have been the behavior of defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.' Bein v. Heath, 6 How. 228, 247 [12 L.Ed. 416]. Thus while 'equity does not demand that its suitors shall have led blameless lives, Loughran v. Loughran, 292 U.S. 216, 229 [54 S.Ct. 684, 689, 78 L.Ed. 1219], as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 [54 S.Ct. 146, 147, 78 L.Ed. 293]; Johnson v. Yellow Cab [Transit] Co., 321 U.S. 383, 387 [64 S.Ct. 622, 624, 88 L.Ed. 814]; 2 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 379–399.

"This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' Keystone Driller Co. v. General Excavator Co., supra, [290 U.S. 240] 245, 256 [54 S.Ct. 146, 147, 148, 78 L.Ed. 293]. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

"Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its

assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public. The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance. See Morton Salt Co. v. [G. S.] Suppiger Co., 314 U.S. 488, 492–494 [62 S.Ct. 402, 405, 406, 86 L.Ed. 363]." Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814, 815, 65 S.Ct. 993, 997, 998, 89 L.Ed. 1381.

Earlier the Supreme Court said in Deweese v. Reinhard, 165 U.S. 386, 390, 17 S.Ct. 340, 341, 41 L.Ed. 757:

" * * * A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity."

Here the plaintiff's whole difficulty arises because it admittedly took from Flowers what it claims to be a binding contract, but which it agreed with Flowers it would, in effect, represent was not in existence in order to deceive others who had a very material and important interest in the subject matter. If there had been a straightforward execution of the document, followed by its filing with the Commissioner, none of the legal problems now presented to this court to untangle would exist. We think no party has the right thus to create problems by its devious and deceitful conduct and then approach a court of equity with a plea that the pretended status which it has foisted on the public be ignored and its rights be declared as if it had acted in good faith throughout.

When it became apparent from uncontradicted testimony of Mara that this deceit was practiced in order to bring into being the "contract" sued upon, the trial court should have dismissed the suit

To the extent that the final judgment of the trial court dismissed the complaint as amended, with costs adjudged against the plaintiff, the said judgment is affirmed. To the extent that the judgment proceeded to a legal determination as to the validity of the contracts between the parties, we conclude that, in the view we take of the equitable principles applicable, these judgments should not have been reached. The judgment of the trial court is, therefore, modified by striking therefrom paragraphs B and C of section 5 of the said judgment.

As thus modified the judgment is affirmed.