# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30908

United States Court of Appeals
Fifth Circuit

**FILED**

October 29, 2019

Lyle W. Cayce
Clerk

CLAIMANT ID 100235033,

> Requesting Party - Appellant

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA PRODUCTION COMPANY; BP, P.L.C.,

> Objecting Parties - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before OWEN, Chief Judge, and SOUTHWICK and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

As our court and the public well know, the Deepwater Horizon oil spill in 2010 led to a massive settlement between BP and class action plaintiffs. The Economic and Property Damages Class Action Settlement Agreement adopted streamlined procedures for processing claims in the hopes of speedily granting relief and concluding litigation. To that end, one innovation of the Settlement Agreement was to simplify the inquiry into causation—the process of determining whether and to what extent the oil spill caused a given claimant's asserted injury. *See In re Deepwater Horizon*, 753 F.3d 509 (5th Cir. 2014); *In*

No. 18-30908

*re Deepwater Horizon*, 744 F.3d 370 (5th Cir. 2014); *In re Deepwater Horizon*, 732 F.3d 326 (5th Cir. 2013). This simplification reduced much of the scrutiny that might be devoted to causation in an ordinary tort case. In some instances, this has meant an award might go to a claimant who, in conventional litigation, would have failed to establish causation for one reason or another. This altered causation inquiry furthered a fundamental goal: avoiding the "overwhelming" administrative burden that would follow if we treated every Deepwater Horizon claimant with the scrutiny that confronts the typical tort plaintiff. *In re Deepwater Horizon*, 744 F.3d at 377. It likewise made it possible to encompass the extensive but diffuse effects of the environmental catastrophe and regionalized economic crisis that was the Deepwater Horizon disaster, which might otherwise have seemed too attenuated under ordinary causation analysis.

The questions in the present appeal stem from that reduced causation inquiry: whether a claimant's alleged unlawful conduct wholly or partially disqualifies it from the Settlement Program and, if so, what evidence is adequate to show that the claimant engaged in such conduct. Common sense would seem to furnish answers. Surely bank robbers could not file a Deepwater Horizon claim on the ground that the oil spill left banks along the Gulf Coast with less cash to grab. Just as surely, the mere allegation of wrongdoing, without more, should not disqualify a claimant from recovering its damages.

And yet, simple as these questions may seem, the parties have been unable to give us clear answers that are rooted in the Settlement Agreement or other law. Given that, and given the recurrence of the issues this appeal implicates, we reverse the district court's decision to decline discretionary review and remand for further proceedings.

2

No. 18-30908

I

The Claimant describes itself as "a Florida company that provided back office support to clients," such as voicemail, fax, and tech support. According to BP, the Claimant is no longer in business, though the record does not make the current status of the company entirely clear.

The Claimant submitted a Business Economic Loss (BEL) claim as a Zone C claimant in July 2013.

In 2011, the Claimant featured in a report by the majority staff of the U.S. Senate Committee on Commerce, Science, and Transportation, *Unauthorized Charges on Telephone Bills*.[1] The report concerned the problem of "cramming": unauthorized charges to telephone users by third-party vendors—that is, by companies other than the provider of the phone service. The report described the scope of the problem, as well as enforcement efforts by the Federal Trade Commission (FTC) and various state attorneys general. The Committee's investigation initially focused on the then-largest companies providing landline phone service, AT&T, Qwest, and Verizon, and eventually expanded to include the Claimant, among others. Though couched in suggestive language, the Committee's report made damning allegations against the Claimant. For instance, the report alleged that the Claimant and other companies were "each part of complex enterprises that are engaged in cramming and designed to conceal their true activities and structure from the public and telephone companies."

Enforcement actions by the FTC followed. AT&T, which appeared in the report, agreed to pay $105 million to settle cramming charges.[2] The Claimant

---

[1] STAFF OF S. COMM. ON COMMERCE, SCI., & TRANSP., 112TH CONG., UNAUTHORIZED CHARGES ON TELEPHONE BILLS (2011), *accessible at* https://ecfsapi.fcc.gov/file/7021859847.pdf.

[2] Press Release, Federal Trade Commission, AT&T to Pay $80 Million to FTC for Consumer Refunds in Mobile Cramming Case (Oct. 8, 2014), https://www.ftc.gov/news-

No. 18-30908

points to another substantial settlement by numerous corporate and individual defendants.[3] The Claimant notes that, by contrast, the FTC "closed its inquiry" into the Claimant in 2013 without a penalty or settlement.[4]

In December 2013, the Claimant and associated entities and individuals entered into a settlement agreement with the Florida Attorney General, labeled an "Assurance of Voluntary Compliance" (AVC) by that office. The AVC had the following disclaimer:

> [T]his AVC does not constitute a finding of law or fact, or any evidence supporting any such finding of law or fact by any court or agency that Respondents have engaged in any act or practice declared unlawful by any laws, rules, or regulations of the State of Florida or as might apply or be applied in Florida. Respondents deny any liability or violation of law and enter into this AVC without any admission of liability. The parties intend that this AVC shall not be used as evidence against Respondents in any action or proceeding other than in an action or proceedings brought by the Attorney General to enforce its terms.

The AVC briefly described the Claimant's billing practices and noted that it and its associates had already refunded or credited customers $2 million. The AVC provided that the Claimant would pay an additional $165,447 in restitution to various consumers and government entities. The AVC also enjoined the Claimant from enrolling any Florida customers in "services billable to Florida landline or mobile telephone bills" or causing any charges to appear on Florida telephone bills.

---

events/press-releases/2014/10/att-pay-80-million-ftc-consumer-refunds-mobile-cramming-case.

[3] Press Release, Federal Trade Commission, FTC Wraps up Major Phone Cramming Case as Remaining Defendants Settle Charges (June 23, 2017), https://www.ftc.gov/news-events/press-releases/2017/06/ftc-wraps-major-phone-cramming-case-remaining-defendants-settle. None of these defendants seems to have appeared in the Senate report.

[4] The parties did not supply any FTC documentation explaining the agency's declination.

4

No. 18-30908

As noted, the Claimant submitted a BEL claim to the Court-Supervised Settlement Program in 2013. In April 2015, the Claims Administrator issued a "Notice of Request for Document Verification" to the Claimant concerning the Florida settlement. The notice directed the Claimant to

> Provide a breakout of the revenues and corresponding expenses reported on the 2007, 2008, 2009, 2010, and 2011 profit and loss statements that are applicable to the terms in the settlement agreement reached with the Florida Attorney General's office related to unauthorized charges billed by the claimant to its clients.

In June,[5] the Claimant submitted a spreadsheet of "revenue and corresponding expenses refunded to Claimant's Customers, by month and year, according to the settlement agreement reached with the Florida Attorney General's office."[6]

In December 2015, the Claims Administrator notified the Claimant that its claim had been flagged for review by the Fraud, Waste, or Abuse (FWA) Department, and it gave the Claimant the option to withdraw.[7] In February 2016, the Claims Administrator notified the Claimant that an investigation had been opened. That October, the Claims Administrator informed the Claimant that its claim had been denied. The FWA review had "revealed clear and compelling evidence" that the claim contained "false, misleading, forged, or fabricated documents, information, or statements." The Claims Administrator explained that the Claimant's allegedly lost revenues were

---

[5] The Claims Administrator had to send the notice twice, because the Claimant did not respond the first time.

[6] In its brief, BP asserted that the Claimant never responded. That was wrong and rebutted by the record, as counsel for BP acknowledged at oral argument. *See Claimant ID 100235033 v. BP Explor. & Prod., Inc.* (5th Cir. May 1, 2019) (No. 18-30908), http://www.ca5.uscourts.gov/OralArgRecordings/18/18-30908_5-1-2019.mp3.

[7] The district court had appointed former FBI Director Louis Freeh as Special Master in July 2013 to investigate fraud and abuse in the Settlement Program, to develop anti-fraud and anti-corruption protocols, and to initiate actions to "claw back" ill-gotten payments from the Settlement Program. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 2015 WL 12724047, at *1–3 (E.D. La. Feb. 26, 2015).

"derived primarily, if not solely from Cramming, an illegal activity." The Claims Administrator ruled that "such damages are not cognizable under the terms of the Settlement Agreement, nor allowed as a matter of public policy," though it did not mention any particular law or Settlement Agreement provision. As evidence, the Claims Administrator cited the Senate report on cramming.

The Claimant sought reconsideration, challenging the Senate report's contents as "unsubstantiated and unproven charges" and not the work of a "law enforcement agency." The Claimant professed full cooperation with the FTC and represented that the FTC's investigation "found no wrongdoing" and closed without charges or a settlement. The Claimant also enclosed a "white paper" from the law firm of Skadden Arps that described the Claimant's legitimate business practices and critiqued the Senate report.

In August 2017, the Claims Administrator again denied the Claimant's claim. The denial notice added no new reasoning but noted that a new reviewer had made the decision.

In December 2017, however, the Claims Administrator informed the Claimant that the initial "Notice of FWA Claim Denial" had been "overturned" and the claim "referred for continued processing." It did not say why.

But on January 9, 2018, the Claims Administrator again denied the Claimant's claim. The notice, now more equivocal, explained that the Claimant's revenues "relate[d,] at least in part, to cramming" from 2007 to 2011. It no longer mentioned the FWA review, and no reference to any evidence or to any provision of the Settlement Agreement appeared in the notice. The Claimant again requested reconsideration, protesting the dearth of evidence and pointing to the outcome of the FTC's investigation as exculpatory. In February 2018, the Settlement Program again denied the claim, the fourth time it did so, providing precisely the same explanation as the previous denial.

No. 18-30908

The Claimant appealed, addressing the Senate report, FTC investigation, and settlement with the Florida Attorney General.

In May 2018, the Appeal Panel affirmed the denial. It recounted the Senate report's discussion of cramming and its allegations as to the Claimant's business structure. It acknowledged that the FTC's investigation closed without an enforcement action. It also noted the Florida Attorney General settlement's avowal that it was not a finding or admission of illegal conduct. The Appeal Panel then fell back on the "[m]ore important[]" Senate report, concluding that its "findings . . . establish that [the C]laimant was guilty of illegal activity and the ill gotten gains from these activities are represented in [the Claimant's] financials which form the basis of this claim." Because the Claimant's recovery "would be based, at least in part, on the company's illegal conduct," the Appeal Panel affirmed the denial of the claim.

The Claimant timely but unsuccessfully sought discretionary review from the district court, bringing this appeal to our court.


II

We review the district court's denial of discretionary review for abuse of discretion. *Holmes Motors, Inc. v. BP Explor. & Prod., Inc.*, 829 F.3d 313, 315 (5th Cir. 2016). We typically consider "whether the decision not reviewed by the district court actually contradicted or misapplied the Settlement Agreement, or had the clear potential to contradict or misapply the Settlement Agreement." *Id.* (quotation omitted). "[M]aking an error of law constitutes an abuse of discretion." *BP Explor. & Prod., Inc. v. Claimant ID 100281817*, 919 F.3d 284, 287 (5th Cir. 2019) (quotation omitted). That said, the district court is not obligated to review all cases raising "a question about the proper interpretation of the Settlement Agreement." *Holmes Motors*, 829 F.3d at 316. It is not an abuse of discretion to deny review if the appeal simply raises "the

No. 18-30908

correctness of a discretionary administrative decision" in a claimant's unique case. *Claimant ID 100212278 v. BP Explor. & Prod., Inc.*, 848 F.3d 407, 410 (5th Cir. 2017) (quotation omitted). It may be an abuse, however, if the district court "den[ies] a request for review that raises a recurring issue on which the Appeal Panels are split if 'the resolution of the question will substantially impact the administration of the Agreement.'" *Id.* (quoting *In re Deepwater Horizon*, 632 F. App'x 199, 203–04 (5th Cir. 2015)).[8]

III

The Claimant and BP disagree both on the factual question specific to this case—whether disqualifying illegal conduct by the Claimant was adequately shown—and on the legal rules for disqualifying claimants due to illegal activity. Had this appeal simply presented the first of these two disputes, we would not likely reverse the district court's denial of discretionary review.[9] But the parties have not been able to articulate rules, rooted either in

---

[8] We have found that a denial of discretionary review was an abuse of discretion in varying circumstances. *See, e.g.*, *BP Explor. & Prod., Inc. v. Claimant ID 100281817*, 919 F.3d 284, 287–89 (5th Cir. 2019) (reversing denial where award contradicted Settlement Agreement's text, though not in any apparently recurring manner); *BP Explor. & Prod., Inc. v. Claimant ID 100094497*, 910 F.3d 797, 800–03 (5th Cir. 2018) (reversing denial and supplying new test for distinguishing "fixed" from "variable" expenses, because issue frequently recurred and appeal panel misapplied Settlement Agreement); *BP Explor. & Prod., Inc. v. Claimant ID 100301594*, --- F. App'x ---, 2019 WL 2477212, at \*1 (5th Cir. June 12, 2019) (reversing denial because intervening Fifth Circuit decision "squarely contradict[ed]" appeal panel decision); *BP Explor. & Prod., Inc. v. Claimant ID 100195328*, 766 F. App'x 141, 145–46 (5th Cir. 2019) (reversing denial due to misapplication of Settlement Agreement by Claims Administrator in policy document, where recurrence was suggested because "several examples of the application of this Policy appear to exist").

[9] We consistently affirm denials of review in cases questioning only the correctness of the Claims Administrator's decision on the facts of the case. *See, e.g.*, *Claimant ID 100154392 v. BP Explor. & Prod., Inc.*, --- F. App'x ---, 2019 WL 2866494 (5th Cir. July 2, 2019); *BP Explor. & Prod., Inc. v. Claimant ID 100157225*, --- F. App'x ---, 2019 WL 2719916 (5th Cir. June 28, 2019); *Claimant ID 100324302 v. BP Explor. & Prod., Inc.*, --- F. App'x ---, 2019 WL 2323647 (5th Cir. May 30, 2019); *BP Explor. & Prod., Inc. v. Claimant ID 100283067*, --- F. App'x ---, 2019 WL 2144391 (5th Cir. May 15, 2019).

the Settlement Agreement or in some other source of law, that explain why the Claimant should be disqualified from recovery—or why it should not—when its revenues derived "at least in part" from illegal activity. Nor has BP been able to explain the evidentiary threshold for such disqualification, if the law indeed requires it. Due to that void at the base of the parties' arguments, and to a split among appeal panels in the resolution of comparable cases, we conclude that the district court's denial of review was an abuse of discretion.

A

We begin with a brief review of the causation inquiry that claimants must satisfy in order to obtain an award from the Settlement Program. The Claimant is from Zone C and is not part of an industry that the Settlement Agreement excuses from demonstrating causation.[10] Accordingly, it must satisfy one of several revenue-based causation tests set out in Exhibit 4B of the Settlement Agreement.[11] These tests compare a claimant's financial performance before and after the spill, thereby ensuring "a temporal relationship to the spill." *In re Deepwater Horizon*, 858 F.3d 298, 301 (5th Cir. 2017). This temporal relationship supplements the geographic relationship established by a claimant's residence in a zone near the spill. "Causation is, in all other respects, presumed." *Id.*

We approved this approach to causation in a series of decisions concerning Exhibit 4B early in the life of the Settlement Program. *See In re Deepwater Horizon*, 753 F.3d 509 (5th Cir. 2014); *In re Deepwater Horizon*, 744 F.3d 370 (5th Cir. 2014); *In re Deepwater Horizon*, 732 F.3d 326 (5th Cir. 2013).

---

[10] For instance, charter fishing businesses and seafood wholesalers were excused from showing causation. *See* Ex. 4B at 1, *Deepwater Horizon* Economic and Property Damages Settlement Agreement As Amended on May 2, 2012, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-2179 (E.D. La. May 3, 2012), ECF No. 6430-9. ECF LAED 2:10-md-2179, 6430-10, 2.

[11] ECF LAED 2:10-md-2179, 6430-10, 2–6.

The question in these cases was whether the Settlement Agreement's method of assessing causation satisfied the traceability component of Article III's standing requirements. *See* 744 F.3d at 375–78; *id.* at 383–84 (Clement, J., dissenting).

As explained in the second of these decisions, the Settlement Agreement established that, if a claimant met the geographic and temporal requirements, "traceability between [BP's] conduct and a claimant's injury would be satisfied . . . by a certification on the document that the claimant was injured by the *Deepwater Horizon* disaster." 744 F.3d at 376. The certification, done under penalty of perjury, was that one's losses were "*due to the spill.*" *Id.* This combination of geography, timing, and attestation would permit the parties to avoid "the claims administrator's investigating the existence and degree of nexus between [every] loss and the disaster in the Gulf," sure to be an "overwhelming" administrative burden. *Id.* at 377. As to cases lacking an apparent causal nexus, we acknowledged that no "specific provision in the Settlement Agreement" seemed to address such cases. *Id.* at 378. Accordingly, it was left to the Claims Administrator, parties, and district court to "resolve real examples of implausible claims" in the same way they might resolve any other factual question. *Id.*

In the third of these decisions, we considered BP's argument that "there are certain claimants who, while they meet every explicit evidentiary standard in Exhibit 4B, should be denied recovery by the Claims Administrator if their claim lacks an actual causal nexus to the *Deepwater Horizon* disaster." 753 F.3d at 514. We rejected BP's argument, explaining that "Exhibit 4B explicitly contains no requirement that the Claims Administrator perform an additional calculation or take an additional step to ensure that each paid claim has a direct causal nexus to BP's conduct." *Id.* at 513.

No. 18-30908

Alongside this parsimonious approach to causation, the district court developed and we approved a framework to address fraud in the Settlement Program. *See In re Deepwater Horizon*, 643 F. App'x 377, 379 (5th Cir. 2016). Following an external investigation into a particular conflict of interest, a court-appointed special master developed anti-fraud and anti-corruption protocols for the Settlement Program. *In re Oil Spill*, 2015 WL 12724047, at *2–3. The special master was also empowered to bring actions to recover funds paid on false or fraudulent claims. *E.g.*, *In re Deepwater Horizon*, 857 F.3d 246, 249–52 (5th Cir. 2017); *In re Deepwater Horizon*, 643 F. App'x at 379. The special master's "clawback" actions were not based on any particular provision of the Settlement Agreement. Rather, they proceeded from the district court's inherent power to enforce settlement agreements and to sanction litigation misconduct. *In re Deepwater Horizon*, 643 F. App'x at 380–81. We have adjudicated the special master's clawback motions as common-law fraud claims arising under general maritime law. *See In re Deepwater Horizon*, 857 F.3d at 249. Thus, though not a creation of the Settlement Agreement, the special master has played a substantial part in the administration of the Settlement Program.

B

Before taking up the parties' answers to the questions raised in this appeal, we examine a set of appeal panel decisions to see whether they have split on recurring issues with a substantial impact on the Settlement Program. Between them, the parties brought twelve decisions to our attention. Six, though perhaps superficially similar, address different problems.[12] The other

---

[12] Two decisions identified by the Claimant, Appeal Panel Decision (APD) 2016-122 and APD 2016-82, said that allegations by BP against claimants must be supported by record evidence, but these decisions concerned dissimilar situations. Two other decisions, APD 2015-1274 and APD 2014-591, concerned alternative causes of claimants' post-spill revenue declines. That is a different matter than we confront here: the potential disqualifying effect

six decisions, however, indicate that those panels would likely have reached a different conclusion had they handled the Claimant's case.

The most divergent decision is APD 2018-964, which concerned a Louisiana attorney convicted in 2011 of conspiracy to commit fraud. He was suspended from practicing law in October 2011, a year and a half after the spill, and sentenced to jail time. The lawyer contended that the spill caused his revenue to decline and that the cessation of his law practice in October 2011 was a "factor outside his control" preventing the recovery of his revenues in the post-spill period.[13] The Claims Administrator apparently accepted this argument and determined that he was eligible for an award. BP appealed. As understood by the Appeal Panel, "BP suggest[ed] that [the lawyer] is somehow foreclosed from receiving an award because he would then be profiting from his own wrongdoing." The Appeal Panel rejected BP's argument, in strong terms as "complete nonsense," viewing it as "an alternative causation argument which is not sanctioned by the Settlement Agreement or allowed by the [Fifth Circuit]."

Five decisions seem to find a middle ground: unlawful conduct may cause disqualification—or at least a reduced award—but only if it is adequately established. In APD 2016-948, the claimant, a Key West hotel that experienced a hazardous carbon monoxide leak, closed for a period of months, and the State

---

if pre-spill conduct is shown to be unlawful. The Claimant also cites APD 2017-3975, but that decision addressed the possibility of fraudulent entries in records submitted to the Settlement Program, also a different matter. Similarly, APD 2016-417 concerned a claimant whose former employer had been investigated by the Florida Attorney General and reached a settlement. The decision considered her obligation to report the investigation, again a different issue.

[13] Under one of Exhibit 4B's revenue-based causation tests, a claimant may show a post-spill revenue decline and then one of several "factors outside the control of the claimant that prevented the recovery of revenues in 2011." Those factors include, for instance, the entry of a competitor or the bankruptcy of a significant customer. ECF LAED 2:10-md-2179, 6430-10, 4. *See Claimant ID 100128765 v. BP Explor. & Prod., Inc.*, 709 F. App'x 771, 772–73 (5th Cir. 2017).

Attorney for Monroe County, Florida investigated the hotel for negligence. The State Attorney did not pursue charges, concluding that the episode did not indicate the "conscious intent to harm" or the "gross and flagrant negligence" that might warrant them. BP argued that "well-established judicial precedent and holdings in prior Appeal Panel Decisions prohibit a Claimant from profiting from its own illegal conduct." Noting the State Attorney's decision not to file charges, the Appeal Panel rejected BP's argument and affirmed the hotel's award.

In APD 2016-704, the claimant, a Florida dentist, was investigated by the state's Medicaid Fraud Control Unit. The dentist had been erroneously using a billing code for "conscious sedation," which requires a permit the dentist did not have. The dentist reached a settlement agreement with the Florida Attorney General under which he corrected the billing error, paid back funds, and otherwise experienced no sanction. The State Board of Dentistry dismissed its pending complaint against the dentist, also without sanction. Appealing the dentist's award, BP argued that his claim should be barred "by the doctrine forbidding compensation based on illegal activities" or at least reduced to not compensate "illegal profit streams." Finding that BP's accusations had "no merit," the Appeal Panel affirmed the award.

In APD 2015-1535, the claimant, an Alabama appliance retailer, was the subject of local news reports, civil suits, and government investigations concerning its alleged failure to issue customer refunds. BP argued that these activities mandated an FWA review. The Appeal Panel disagreed. The issues with customers had been resolved; the civil suits were actually about unrelated matters; and all investigations had been closed without indictments or criminal charges against the claimant. The panel ruled that "BP's contentions are nothing short of speculation without support in the record."

In APD 2015-1434, the claimant, a Louisiana provider of "home nursing and health care services," and its parent company were sued by the U.S. Department of Justice under the False Claims Act.[14] The suit settled, with the Justice Department acknowledging that the allegations were "unproven" and that there was no "determination of liability." BP argued that the claim should be referred for FWA review "to determine (1) whether the entire claim is barred by the doctrine which prohibits profiting from illegal activity; and (2) if not entirely barred, what reductions must be made to remove revenue generated by illegal activity." The Appeal Panel affirmed the claimant's award and rejected BP's argument, ruling that settlement of the litigation "without an admission or determination of wrongdoing is, and should be, of no moment to the Claims Administrator in this case." APD 2015-1526 concerned another subsidiary of the same parent company, so that panel affirmed for the same reasons given in APD 2015-1434.

Like the present case, these five decisions involved government investigations that ended either without charge, in the cases of the Key West hotel and the Alabama appliance retailer; with a settlement, in the cases of the home-nursing companies; or both, in the case of the Florida dentist. The panel handling each decision concluded that the record did not show evidence of wrongdoing sufficient to disqualify the claimant. Each rejected arguments from BP substantially similar to the ones that BP advances here.

BP contends that there is no panel split; the record of the Claimant's wrongdoing here simply is stronger than in these other cases. To be sure, each set of facts is unique to some degree, but comparison still is reasonable. The Claimant persuasively argues that the Senate report is not a conclusive,

---

[14] The Justice Department had alleged that the companies were "participating in a scheme to defraud the Medicare System" by, for instance, "billing for ineligible services and unnecessary care."

reliable work by a law enforcement agency and so should not be taken as evidence of wrongdoing. The FTC's decision to decline enforcement situates the Claimant similarly to the Key West hotel and the Alabama retailer. Likewise, the Claimant's settlement agreement with the Florida Attorney General, disclaiming any admission or finding of wrongdoing, resembles the agreements reached by the Florida dentist and the home-nursing companies. BP does not argue expressly that the cumulative effect of the Senate report and Florida Attorney General investigation are enough to establish wrongdoing, but if it did, such an argument would run counter to the decisions in the Florida dentist's case and the Alabama retailer's case, where multiple government entities each scrutinized the claimant and then declined to act.

Consequently, we find a three-way split among appeal panels on the significance of wrongdoing: (1) not disqualifying, even if conclusively demonstrated, as in the case of the Louisiana lawyer; (2) perhaps disqualifying but only if adequately demonstrated, as in the five decisions just discussed; and (3) disqualifying even if just alleged, as in the present appeal.

C

We still might affirm the district court's denial of discretionary review if the treatment of the Claimant's appeal were simply a one-off determination under a settled framework of law. No such framework seems to exist, however, and the parties have neither agreed nor persuaded us what that framework ought to be.

The Claimant's view is that, because it fully satisfied the causation requirements of the Settlement Agreement, BP's allegations of illegality cannot prevent it receiving an award. Though that might decide this appeal if we agreed with the Claimant about the strength of BP's evidence, the Claimant's view does not help us resolve cases of claimants with better-demonstrated or obvious wrongdoing. At oral argument, the Claimant

suggested that a "wholly illegal enterprise" would clearly be disqualified from recovery but did not identify a source of law for that rule.[15] Such a rule also would not help to decide whether, if only a portion of the claimant's activity is proven unlawful, partial or full disqualification should result.

BP's view is that, "[a]s a matter of law, parties cannot be awarded compensation for illegal activity," basing this principle on cases applying "the doctrine of unclean hands." A point in BP's favor is that the district court previously entertained the possibility that the unclean-hands doctrine might disqualify a claimant involved in illegal conduct. *See In re Oil Spill*, 2015 WL 12724047, at *2–3.[16] But the district court ultimately concluded that the claim at issue was legitimate and untainted by misconduct, *id.*, so the case did not require the court to say precisely how and to what extent misconduct might disqualify a claimant.

Otherwise, BP does not identify applicable caselaw to support its invocation of the unclean-hands doctrine. The Settlement Agreement is a contract governed by maritime law. *Holmes Motors*, 829 F.3d at 315. BP has put forward no authority showing that unclean hands, an equitable doctrine, applies when a party seeks relief under a contract.[17] Contrary authority exists,

---

[15] *Claimant ID 100235033 v. BP Explor. & Prod., Inc.* (5th Cir. May 1, 2019) (No. 18-30908).

[16] Attorneys that had represented claimants went to work for the Settlement Program but then received payments from the lawyers to whom they had referred their clients. 2015 WL 12724047 at *1–2. When this came to light, the district court appointed the aforementioned special master. ECF EDLA 2:10-md-02170, 10564. Among the attorneys involved was Jon Andry, and the Andry Law Firm had itself filed a BEL claim. 2015 WL 12724047 at *3. Following the special master's initial report, the district court ordered the firm to show cause why the court should not adopt the special master's recommendation "disallowing the Andry Law Firm's claim under the Unclean Hands Doctrine." ECF EDLA 2:10-md-02170, 11288, 3.

[17] BP cites five cases, none by this court and none dealing with analogous situations. First, BP cites *Ashwood v. Patterson*, 49 So.2d 848 (Fla. 1951), in which a husband killed his wife and then killed himself, leaving the court with the question of who owned their property. *Id.* at 849. Second, BP cites *Kulla v. E.F Hutton & Co., Inc.*, 426 So.2d 1055 (Fla. App. 1983),

and it is cause to doubt BP's theory. *See Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 774 (5th Cir. 2010) (explaining, in case governed by Texas law, that "the affirmative defense of unclean hands is available only in equity"); *Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 869 n.7 (9th Cir. 1992) (ruling that unclean hands "could not be used to bar a suit for damages for breach of contract").[18] Applications in the maritime context reflect this distinction between legal and equitable relief. *Compare Dziennik v. Sealift, Inc.*, 2013 WL 5502916, at *8–9 (E.D.N.Y. Sept. 30, 2013) (entertaining unclean-hands doctrine in maritime case as argument against defendant's invocation of laches), *with CMA CGM S.A. v. AZAP Motors, Inc.*, 2015 WL 9601157, at *7 (E.D. Va. Nov. 25, 2015), *report and recommendation adopted by* 2016 WL 50926 (E.D. Va. Jan. 4, 2016) (rejecting application of unclean hands to purely contractual claims in maritime context).

---

in which Kulla sued Hutton for giving him a bad stock tip and Hutton argued in response that Kulla had himself "actively participated" in the fraud scheme. *Id.* at 1056–57. Third, BP cites *Guillie v. Comprehensive Addiction Programs, Inc.*, 735 So.2d 775 (La. App. 1999), in which a man with alcohol and gambling problems argued he was misdiagnosed during a hospitalization and the failure to diagnose his bipolar disorder was the cause of his later troubles (most notably, being fired after stealing from his employer). *Id.* at 776–79. Fourth, BP cites *Allvend, Inc. v Payphone Communications Co., Inc.*, 804 So.2d 27 (La. App. 2001), in which a payphone company surreptitiously surveilled a competitor and then brought trumped-up unfair trade practices and other claims. *Id.* at 28–34. Fifth, and finally, BP cites *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel*, 742 F. Supp. 2d 784 (E.D. Va. 2010), in which the entity that had found and recovered artifacts from the wreck of the Titanic sought a "salvage award" for its efforts and the district court considered whether it had engaged in "disqualifying salvor misconduct." *Id.* at 788, 803–04. The last of these at least is a maritime case, but it dealt with too-different an issue to guide us on the unclean-hands doctrine's application here.

[18] The Claimant brings three germane, unpublished district court decisions to our attention. *See Nautilus Neurosci., Inc. v. Fares*, 2013 WL 6501692, at *4 (S.D.N.Y. Dec. 11, 2013) ("[T]he doctrine is not a defense to [a] breach of contract claim for money damages."); *Royal Palm Properties, LLC v. Premier Estate Properties, Inc.*, 2010 WL 3941745, at *2 (S.D. Fla. Oct. 6, 2010) ("[T]he unclean hands doctrine traditionally only applies to equitable remedies and does not bar a plaintiff from recovering damages."); *S.E.C. v. Eberhard*, 2006 WL 17640, at *3 (S.D.N.Y. Jan. 3, 2006) ("Unclean hands can only be asserted with respect to equitable—not legal—claims.").

No. 18-30908

These cases comport with our decisions applying the unclean-hands doctrine. *See State of Israel v. Motor Vessel Nili*, 435 F.2d 242, 248–49 (5th Cir. 1970) (applying unclean-hands doctrine to mortgagee of vessel, seeking foreclosure, in priority dispute with maritime lienholders); *see also Meis v. Sanitas Service Corp.*, 511 F.2d 655, 657–58 (5th Cir. 1975) (considering unclean-hands argument in suit for equitable rescission of corporate merger agreement); *N.Y. Football Giants, Inc. v. L.A. Chargers Football Club, Inc.*, 291 F.2d 471, 473–74 (5th Cir. 1961) (rejecting equitable remedy of specific performance due to plaintiff's unclean hands).[19]

BP's reliance on the unclean-hands doctrine has the added problem that the inequitable conduct of the party at issue ordinarily must bear a direct relationship to the proceeding in which the doctrine is invoked. "The maxim of unclean hands is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties." *Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)). "The alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct." *Id.* For instance, in a suit seeking rescission of a merger due to pre-merger misrepresentations, the plaintiff's alleged post-merger misbehavior was held not to bar his suit. *Meis*, 511 F.2d at 657–58. "After all, 'Equity does not demand that its suitors

---

[19] Decisions of other circuit courts in the maritime context do not give us reason to think that the unclean-hands doctrine applies outside of claims for equitable relief. *See, e.g.*, *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 947 (9th Cir. 2013) (considering doctrine's implications in ruling on preliminary injunction); *Columbus-America Discovery Grp. V. Atlantic Mut. Ins. Co.*, 56 F.3d 556, 569–70 (4th Cir. 1995) (considering but rejecting unclean-hands argument against equitable award for salvor of shipwreck); *Williams v. Jones*, 11 F.3d 247, 256–58 (1st Cir. 1993) (ruling, in suit seeking writ to enforce award under Longshore and Harbor Workers' Compensation Act, that employer could raise unclean-hands defense in Department of Labor administrative proceedings).

shall have led blameless lives.'" *Id.* at 658 (quoting *Loughran v. Loughran*, 292 U.S. 216, 229 (1934)). By contrast, in a priority dispute regarding a vessel, a mortgagee was held to have unclean hands because it delayed foreclosing on the vessel and the competing liens arose only during that delay. *See Motor Vessel Nili*, 435 F.2d at 249. Similarly, in a suit for specific performance of a contract negotiated in secret, the plaintiff's unclean hands barred its claim because the secrecy was for nefarious purposes. *See N.Y. Football Giants*, 291 F.2d at 474. BP cannot show that direct relationship here, nor could it in the other appeal panel decisions from which the present one split.

We do not decide here the legal standards that should apply to claimants alleged to have engaged in unlawful conduct, and we do not rule out alternate sources of law that might shape those standards but have not been discussed here.[20] We certainly do not say that the Claimant must prevail on remand. The parties' briefing to us focused more on the Claimant's history and on the existence of panel splits than on the legal regime that should govern disqualification due to illegal conduct. The latter issue thus has not received the full adversarial treatment it deserves. It is for the district court to consider and decide in the first instance.

---

[20] There is, for instance, a long history in admiralty law of courts invalidating contractual provisions or adopting contractual interpretations based on public policy. *See, e.g., Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 90–91 (1955) (invalidating exculpatory clause in towing contract); *Dow Chem. Co. v. M/V Roberta Tabor*, 815 F.2d 1037, 1045 n.7 (5th Cir. 1987) (following *Bisso*); *Fireman's Fund Am. Ins. Co. v. Boston Harbor Marina, Inc.*, 406 F.2d 917, 920–21 (1st Cir. 1969) (suggesting invalidation of exculpatory clause in vessel storage contract); *cf. Harden v. Gordon*, 11 F. Cas. 480, 483 (C.C.D. Me. 1823) (Story, J.) (interpreting maritime contract of employment to require care for ill or injured seamen, based *inter alia* on "the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation"). If the Settlement Agreement were read to compensate the loss of revenues from unlawful activity, the involvement of federal courts in enforcing the Agreement might well raise substantial public policy concerns.

No. 18-30908

VI

For the foregoing reasons, we REVERSE the denial of discretionary review and REMAND for proceedings consistent with this opinion.